UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| DAVID MICHAEL SMITH, | § | |
| --- | --- | --- |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 3:13-cv-307 |
| | § | |
| THE COLLEGE OF THE | § | |
| MAINLAND, *et al*, | § | |
| | § | |
| Defendants. | § | |

## **MEMORANDUM AND ORDER**

David Michael Smith has long been a gadfly to his employers at The College of the Mainland. Over the years, he has never shied away from making his opinions on controversial issues known to his colleagues and the community alike. He is also no stranger to litigation. About four months after the College settled his most recent civil rights suit in early 2013, it terminated Smith. Smith then filed this lawsuit alleging that his termination was in retaliation for exercising his First Amendment rights in the earlier lawsuit. The College has moved for summary judgment, arguing that Smith has no evidence to support a number of the elements he has to prove in order to prevail on a claim involving retaliation for public employee speech.

## I. BACKGROUND

This suit is the latest flashpoint in a long-running conflict between Smith and the College. Over the years, Smith has filed three federal lawsuits alleging First Amendment retaliation claims. He filed the first in 2009 after the Board of Trustees refused to let him speak at a meeting during time allotted for public comment. *Smith v. Matthews (Smith I)*, 2010 WL 519781 (S.D. Tex. Jan. 20, 2010) (Froeschner, J.). The Court granted Smith's motion for a preliminary injunction, and the case settled in early 2010.

The second suit was filed in 2012 after Smith was reprimanded for violating the College's code of conduct when he voiced his displeasure with the College's decision to end a longstanding policy of deducting union dues directly from the paychecks of employees. The College moved for summary judgment and the Court denied that motion on December 03, 2012, *see Smith v. College of the Mainland (Smith II)*, 2012 WL 6020066 (S.D. Tex. Dec. 3, 2012). The parties settled in January 2013.

Four months later, in May 2013, the College began an investigation into Smith that culminated in his termination. The College's proffered reasons for terminating Smith were that he was insubordinate and fostered a climate of fear amongst his fellow faculty. At the hearing where the College's Board of Trustees voted 6-0-1 to fire Smith, Trustee Bennie

Matthews (who abstained from voting) stated, "He may have won the battle, but I think I have won the war." Docket Entry No. 23 at 44. The College sent Smith a letter informing him of their decision to terminate him on May 20, 2013.

Smith responded by filing this suit. In addition to the College, Smith named the College's President, Dr. Beth Lewis, and Vice President for Instruction, Dr. Amy Locklear, as defendants. Both individuals allegedly instigated and participated in the investigation that ultimately led to Smith's termination. The Defendants have since moved for summary judgment, asserting that Smith's allegations are unsupported and that the individual defendants are entitled to qualified immunity.

## II. STANDARD OF REVIEW

When a party moves for summary judgment, the reviewing court shall grant the motion "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts on questions of fact must be resolved in favor

of the party opposing summary judgment. *See Evans v. City of Houston*, 246 F.3d 344, 348 (5th Cir. 2001) (citation omitted).

## III. THE RETALIATION CLAIM

### A. Elements

A "public employee does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment." *Connick v. Myers*, 461 U.S. 138, 140 (1983) (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968)). On the other hand, the government's interests in regulating the speech of its employees "differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Id.* (quoting *Pickering*, 391 U.S. at 568). The elements a public employee must prove to establish a First Amendment retaliation claim attempt to balance these competing interests. Smith must show that: (1) he suffered an adverse employment action; (2) he spoke on a matter of public concern; (3) his interest in commenting on the matter outweighed the College's interest in promoting efficiency; and (4) his speech motivated the College's action against him. *See Harris v. Victoria Ind. Sch. Dist.*, 168 F.3d 216, 220 (5th Cir. 1999) (citations omitted). The "public concern" and "balancing" elements "are legal in nature and are for the court to resolve." *Branton v. City of Dallas*, 272 F.3d 730, 739 (5th Cir.

2001) (citing *Connick*, 461 U.S. at 147–48 n.7). The final element, "whether plaintiff's protected speech was a substantial or motivating factor in the adverse employment decision," is typically a jury question. *Id*.

The College argues that summary judgment is appropriate because Smith has failed to present evidence that could satisfy the second, third, and fourth elements of the standard. It does not dispute that Smith suffered an adverse employment action when he was terminated.

    B. Matter of Public Concern

The College first disputes whether Smith was speaking as a citizen on a matter of public concern. It cites a case finding that a Fair Labor Standards Act lawsuit that a public employee claimed resulted in his dismissal did not involve a matter of public concern. *See Whitehurst v. Abel*, 1995 WL 1945562 (N.D. Miss. Jan. 13, 1995). The prior lawsuit that Smith contends led to his termination was not a private dispute about wages, however; it involved speech concerning an issue the Court found to be a matter of public concern—ending the policy of withdrawing union dues from employees' paychecks. *See Smith II*, 2012 WL 6020066, at *5– Attempting to relitigate what it conceded in the prior two federal cases, the College now argues that the "speech that serves as the basis of Plaintiff's prior lawsuits against COM is administrative in nature, and is therefore not a

matter of public concern entitled to First Amendment protection." But its contention that those lawsuits just addressed internal administrative issues that did not "arise against a background of ongoing public debate about the administration of the university" is belied by the facts of those cases, and not subject to reconsideration here. *See id.* at *5 ("[T]he College does not dispute that Smith was speaking as a citizen on a matter of public concern."); *Smith I*, 2010 WL 519781, at *2 ("The Smiths attempted to speak on a topic of public concern well within the purview of the Board's limited forum during a portion of the meeting specifically designated for such speech.").

Because the 2012 lawsuit involved speech on a "matter of public concern" rather than a "matter only of personal interest" like an FLSA dispute, the College's decision to terminate Smith would be unlawful if made in retaliation for that lawsuit. *See Rathjen v. Litchfield*, 878 F.2d 836, 842 (5th Cir. 1989) ("The law is no different where the act which allegedly gave rise to the retaliation claim is the filing of a grievance or a lawsuit." (citations omitted)); *Oscar Renda Contracting, Inc. v. City of Lubbock*, 463 F.3d 378, 383 (5th Cir. 2006) (holding that a retaliation claim based on filing a previous lawsuit involved a matter of public concern because the prior suit involved First Amendment claims); *cf. Lane v. Franks*, 134 S. Ct. 2369,

2381 (2014) ("And the form and context of the speech—sworn testimony in a judicial proceeding—fortify that conclusion [that the testimony involved a matter of public concern]."). Smith thus has established that the speech he contends is entitled to First Amendment protection—the prior retaliation lawsuit—involved a matter of public concern.

### C. *Pickering* Balancing Test

The College argues that even if his conduct involved a matter of public concern, its interest in maintaining an orderly educational environment outweighed any First Amendment interest Smith had. The *Pickering* test requires the Court "to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568. In doing so, the Court must consider whether Smith's statements impaired "discipline by superiors or harmony among co-workers, ha[d] a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impede[d] the performance of the speaker's duties or interfere[d] with the regular operation of the enterprise." *Salge v. Edna Indep. Sch. Dist.*, 411 F.3d 178, 192 (5th Cir. 2005) (quoting *Rankin v. McPherson*, 483 U.S. 378, 388 (1987)). The

time, place, and manner of Smith's speech are relevant to this determination, as is the context in which it arose. *See Victor v. McElveen*, 150 F.3d 451, 457 (5th Cir. 1998) (quoting *Rankin*, 483 U.S. at 388). The College bears the burden to justify Smith's discharge under this balancing test. *See Connick*, 461 U.S. at 150.

The College contends that Smith was terminated based on "the testimony of eight witnesses regarding [his] abusive and disruptive conduct and its detrimental impact on the workplace," in violation of the College's Code of Conduct. Docket Entry No. 16 at 9. This umbrella of "abusive and disruptive conduct" involved his refusal to unquestioningly implement mandatory guidelines regarding curriculum and office hours; attend training sessions on new technology; "fail[ing] to treat his coworkers and supervisors with respect, dignity and justice"; and "creat[ing] an adversarial environment at the College where employees file grievances and lawsuits without ever attempting to informally resolve disputes." *Id.* at 10–14. The College argues that Smith's actions "caused substantial controversy and disruption and impeded COM's general performance and operation through its impact on his supervisors." *Id.* at 21.

It is first important to determine which of this conduct should be assessed in the *Pickering* balancing test. Smith characterizes the prior

lawsuit as his protected speech and must show (under the element addressed next) that the lawsuit was in fact a motivating factor in his termination. If a jury instead concludes that Smith was fired solely because he did not hold office hours or missed training sessions on technology, then the College prevails and there is no speech interest to balance. Therefore, in conducting the *Pickering* inquiry, it is assumed that the protected speech is the basis for the dismissal. That limits the scope of the *Pickering* inquiry because it is the "speech activity that must give rise to the workplace disruption." *De la Garza v. Brumby*, 2013 WL 754260, at *4 (S.D. Tex. Feb. 27, 2013); *see also Kinney v. Weaver*, 367 F.3d 337, 362 (5th Cir.2004) (en banc) ("As the Supreme Court has made clear, [ ], the relevant issue is not the weight of the governmental interest considered in abstract terms; we look instead to how the speech at issue *affects* the government's interest in providing services efficiently.").

With the scope of the inquiry properly defined, the question is whether the impact of the prior lawsuit on the College's ability to maintain an orderly and efficient workplace outweighs Smith's interest in pursuing the lawsuit. The question largely answers itself. On one side of the equation, Smith's protected conduct—filing a civil rights lawsuit in federal

court on a matter of public concern—invokes strong First Amendment interests.

A "stronger showing [of government interests] may be necessary [when] the employee's speech more substantially involve[s] matters of public concern." *Connick*, 461 U.S. at 152. But the College's interest in preventing any disruption that resulted from filing that lawsuit is not that strong even without adjusting the *Pickering* scale. The College contends that Smith's prior lawsuits chilled speech among the faculty because professors feared they would be sued next. That argument might be compelling if Smith's lawsuits had been frivolous. But the federal court denied summary judgment in one, granted a preliminary injunction in the other, and both cases settled. The filing of a bona fide First Amendment retaliation suit *should* chill future unconstitutional conduct. To hold that a public employee can be fired for filing a legitimate civil rights case because it might have a broader chilling effect would represent a serious affront to the First Amendment rights of public employees. *Cf. Lane*, 134 S. Ct. at 2381 ("Here, the employer's side of the *Pickering* scale is entirely empty: Respondents do not assert, and cannot demonstrate, any government interest that tips the balance in their favor. There is no evidence, for example, that Lane's testimony at Schmitz' trials was false or erroneous or that Lane

unnecessarily disclosed any sensitive, confidential, or privileged information while testifying.").

Moreover, the contention that controversy arising from lawsuits threatens the workplace is not nearly as compelling in the context of a college as it might be in other employment settings. At one end of the spectrum are police departments, which "function as paramilitary organizations charged with maintaining public safety and order, [and therefore] are given more latitude in their decisions regarding discipline and personal regulations than an ordinary government employer." *Nixon v. City of Houston*, 511 F.3d 494, 498 (5th Cir. 2007). In contrast, "expansive freedoms of speech and thought [are] associated with the university environment." *See Grutter v. Bollinger*, 539 U.S. 306, 329 (2003). Indeed, divisiveness among faculty members is so ubiquitous that it spawned the saying that "academic politics is the most vicious and bitter form of politics, because the stakes are so low."[1] *See also* Thomas Sullivan & Lawrence White, *For Faculty Free Speech, the Tide Is Turning*, Chron. of Higher Educ. (Sept. 30, 2013), http://chronicle.com/article/For-Faculty-Free-Speech-the/141951 ("Faculty members sometimes say intemperate things. Their tendency to express themselves forcefully and, on occasion,

---

[1] Although a matter of dispute, this observation is generally credited to Columbia professor Wallace Sayre. *See Sayre's Law*, WIKIPEDIA, http://en.wikipedia.org/wiki/Sayre%27s_law (2014).

provocatively is one of the defining characteristics of university culture."). Therefore, while a government interest in terminating employees who file nonfrivolous civil rights lawsuits may not be a strong one in most employment settings, it is a particularly weak one in the academic setting where dissent is expected.

Another circumstance surrounding Smith's speech makes the *Pickering* analysis an easy call. As in both of the earlier lawsuits, Smith's speech (the *Smith II* lawsuit) "occurred outside of the classroom and thus cannot be shown or presumed 'to have in any way either impeded the teacher's proper performance of his daily duties in the classroom or to have interfered with the regular operation of the schools generally.'" *Smith II*, 2012 WL 6020066, at *6 (quoting *Pickering*, 391 U.S. at 572–73). If the College actually fired Smith for his prior lawsuit and the other proffered reasons are pretextual—as he has alleged and must be assumed in conducting the balancing test—then the Court has no difficulty concluding that the *Pickering* balancing test must be resolved in Smith's favor.

### D. Speech as Motivating Factor

Third and finally, the College argues that summary judgment is appropriate because Smith cannot show that his termination was motivated by his speech. The College faces a tough task in seeking summary judgment

on this "causation" issue because, unlike the *Pickering* balancing test which is a legal issue for the Court to decide, "[w]hether an employee's protected conduct was a substantial or motivating factor in an employer's decision to take action against the employee is a question of fact, ordinarily rendering summary disposition inappropriate." *Click v. Copeland*, 970 F.2d 106, 113 (5th Cir. 1992). That task is even more difficult given that the College is not contending that the firing had nothing to do with Smith's speech. Instead, it attempts to thread a needle by arguing that Smith was fired because of the "manner" of his speech, not its "content." Docket Entry No. 16 at 22.

The temporal proximity between the settlement of Smith's previous lawsuit and his termination helps establish a fact issue on causation. The College settled his prior lawsuit in January 2013. The College sent Smith the notice of his termination on May 20. In the Title VII retaliation context, "[c]lose timing between an employee's protected activity and an adverse action against him may provide the 'causal connection' required to make out a prima facie case of retaliation." *Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997) (citing *Armstrong v. City of Dallas*, 997 F.2d 62, 67 (5th Cir.1993)). That closeness in time is also relevant in the First Amendment retaliation context. *See Mooney v. Lafayette Cnty. Sch. Dist.*, 538 F. App'x 447, 454 (5th Cir. 2013) ("Close timing between an

employee's protected [speech] and an adverse employment action can be a sufficient basis for a court to find a causal connection required to make out a prima facie case of retaliation."); *Nagle v. Marron*, 663 F.3d 100, 111 (2d Cir. 2011) (holding that a sufficient "showing of temporal proximity suffices to make out a *prima facie* claim of retaliation under the First Amendment"). But more than the mere temporal proximity is the College's inability to identify any conduct by Smith between the end of the lawsuit and his termination that led to the decision. When an employer is trying to establish the lack of a causal connection in a retaliation case in which there is temporal proximity, it typically points to nonretaliatory conduct occurring before or after the protected activity. *See, e.g., Sanders v. Sailormen, Inc.*, 506 F. App'x 303, 304 (5th Cir. 2013) ("[I]ntervening events . . . broke the causal link that could otherwise be inferred from temporal proximity."). In Smith's case, the College contends that it fired him less than five months after settling the prior lawsuit not because of a post-lawsuit development or pre-lawsuit plan but because of the totality of conduct that predated the lawsuit. Given the lack of an intervening non-protected incident between the lawsuit and the termination, a jury could conclude that the more recent lawsuit was a motivating factor in the termination.

But the sequence of events is not all that would support that view. There is direct evidence that the prior First Amendment lawsuits were a factor in the termination. In explaining during her deposition why she believed Smith's behavior "detracted from the environment" of the College, Dr. Lewis cited "the constant threat of litigation" and Smith's practice of going "directly to the press." Docket Entry No. 16-3 at 28. She also cited the "constant letter writing campaign to the paper, the constant untruths about, you know, that there are always these lawsuits and yet neglecting to say that the majority of them have been dismissed on summary judgment because there is no merit to them."[2] *Id.* at 50. Moreover, at the Board of Trustees meeting, there was a reference to the prior lawsuits. Trustee Matthews stated "He may have won the battle, but I think I have won the war." Although Matthews recused herself and did not vote, the discussion of the lawsuits in a clearly retaliatory context could lead a jury to believe those considerations influenced those trustees who did vote. Why make the comments other than to try and influence the vote?

For these reasons, there is sufficient evidence on this quintessentially fact-based causation question to allow a jury to decide it.

---

[2] Dr. Lewis never identifies which lawsuits she is referring to as meritless. In both prior federal lawsuits—the only suits brought to this Court's attention—Smith prevailed on the preliminary injunction and summary judgment motions.

## IV. QUALIFIED IMMUNITY

Qualified immunity is generally a steep hurdle for a plaintiff to leap over when asserting a retaliation claim. But in cases like this in which the termination's motivation is so interwoven with its legality, the Fifth Circuit and other courts have held that the qualified immunity question is not properly answered at the summary judgment stage.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity is often granted in public employee speech cases because the *Pickering* balancing inquiry is so case-specific that public officials "would not necessarily know just what conduct was prohibited." *Gunaca v. Texas*, 65 F.3d 467, 474 (5th Cir. 1995). However, "it is entirely appropriate to deny qualified immunity when the balance of cognizable interests weighs so starkly in the plaintiff's favor." *Kinney v. Weaver*, 367 F.3d 337, 372 (5th Cir. 2004) (en banc). In other words, for purposes of qualified immunity, the illegality of First Amendment retaliation is clearly established when the

officials "do not have any relevant, legitimate interests to put on their side of the *Pickering* scales." *Id.*

As discussed, the balance of the interests weighs overwhelmingly in Smith's favor. Smith has a powerful interest in protecting his First Amendment rights by filing the lawsuits. The College's only argument justifying dismissal for this reason is that Smith's meritorious efforts to vindicate his rights made some of his co-workers upset. However, protecting co-workers at an academic institution from feeling mild discomfort at the prospect of violating someone else's constitutional rights does not qualify as a legitimate interest that justifies silencing a public employee's dissent. Without any legitimate interest on its side of the *Pickering* scale, the balancing test was lopsided.

The Court's conclusion that Smith overcomes qualified immunity at the summary judgment stage is reinforced by the previous two lawsuits between Smith and the defendants. The decisions in those cases clearly established that the defendants could not take an even more adverse course of action—terminating Smith—for the even less controversial conduct of filing a meritorious lawsuit to protect his rights.

In light of the foregoing, qualified immunity is denied.

## V. CONCLUSION

For these reasons, Defendants' Motion for Summary Judgment (Docket Entry No. 16) is **DENIED**.

**IT IS SO ORDERED**.

**SIGNED** this 30th day of October, 2014.

_____
Gregg Costa
United States Circuit Judge[*]

---

[*] Sitting by designation.